UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
GUILIA BOTTA,

                             Plaintiff,

       -against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

                      Defendant.

--------------------------------------------------------X

**OPINION AND ORDER**
**12-CV-3403 (SJF)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   FEB 05 2014   ★

LONG ISLAND OFFICE

FEUERSTEIN, District Judge.

     Before the Court are the parties' cross-motions for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c). For the following reasons, the Commissioner's motion is

**GRANTED** and plaintiff's motion is **DENIED**.

## I. Background

### A. Procedural History

     On April 26, 2001, plaintiff Guilia Botta ("plaintiff") filed an application, pursuant to

Title II of the Social Security Act, for social security disability benefits, claiming a back injury

and bursitis in both of her shoulders. Tr. 66-68, 72–75.[2] Plaintiff contends she became disabled

as of December 28, 1998, the date she stopped working, because her condition limited her ability

to sit, stand, walk and bend. *Id.* at 77.

     On September 6, 2001, the Commissioner of Social Security ("Commissioner" or

"Secretary") denied plaintiff's claim on the ground she was not disabled under Social Security's

---

1. The caption has been changed to reflect the current Commissioner of Social Security. The Clerk of the Court is instructed to conform the official caption in accordance with this Order.

2. "Tr." refers to the certified administrative record filed with the Commissioner's answer.

rules. *Id.* at 42. On or about November 9, 2001, plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), claiming the denial was contrary to the evidence and applicable laws. *Id.* at 46-47.

On October 21, 2003, plaintiff and her attorney appeared before ALJ Seymour Fier. *Id.* at 202. On February 19, 2004, ALJ Fier issued an unfavorable decision finding that plaintiff was not disabled within the meaning of the Social Security Act and therefore not entitled to benefits. *Id.* at 18-23. Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied plaintiff's request by notice dated July 29, 2005. *Id.* at 6, 12-13. Plaintiff appealed to the district court in the Eastern District of New York. By Amended Memorandum of Decision and Order dated March, 5, 2007, the Honorable Arthur D. Spatt remanded plaintiff's case to the Commissioner for further administrative proceedings. *Id.* at 384-413.

On January 29, 2008, ALJ Fier held a second hearing at which plaintiff appeared with her attorney. *Id.* at 651. On May 19, 2008, ALJ Fier issued a second unfavorable decision finding that plaintiff was not disabled. *Id.* at 361-77. Plaintiff filed written exceptions with the Appeals Council by letter dated June 5, 2008. *Id.* at 453-76. The Appeals Council remanded the case to the ALJ and directed that the case be assigned to another judge. *Id.* at 484-88.

On July 9, 2009, a hearing was held before ALJ Hazel C. Strauss, who issued an unfavorable decision on November 2, 2009. *Id.* at 318-39, 760-89. Plaintiff filed written exceptions to ALJ Strauss' decision. *Id.* at 271-317. By letter dated June 2, 2012, the Appeals Council advised plaintiff's attorney that it "found no reason under our rules to assume jurisdiction." *Id.* at 230. Accordingly, ALJ Stauss' decision is the Commissioner's final administrative determination. Plaintiff filed the instant action pursuant to the Social Security

Act, 42 U.S.C. § 405(g) on July 10, 2012.

**B.      Non-Medical Evidence**

Plaintiff was born in 1947. Tr. 67. At the January 2008 hearing, plaintiff testified that she had completed kindergarten (*id.* at 661), but at the October 2003 and July 2009 hearings, plaintiff testified that she completed three (3) years of school as a child in Italy. *Id.* at 205, 778. In addition, plaintiff checked off the third grade as the highest level of education completed on her March 2001 adult disability application. *Id.* at 83.

Plaintiff was employed as a sewing machine operator in a bridal shop. *Id.* at 78, 86. In plaintiff's disability application, she claimed that the heaviest weight she had to lift was twenty (20) pounds and that she frequently, i.e., between one (1) to two (2) thirds of the workday, lifted ten (10) pounds. She also claimed that her job required her to sit for seven (7) hours per day; to walk and stand for one (1) half-hour each per day and that she spent one (1) hour per day writing, typing or handling small objects. *Id.* at 78, 87. At her October 2003 hearing, however, plaintiff testified that the heaviest weight she had to lift was thirty (30) pounds. *Id.* at 213.

**1.      Plaintiff's Disability Application**

In her adult disability application and work history report dated March 7, 2001, plaintiff claimed that a back injury and bursitis in both shoulders limited her ability to sit, stand, walk and bend. *Id.* at 77. She claimed that her injuries began bothering her on December 28, 1998, the date she became disabled and stopped working. *Id.*

As stated in the application, plaintiff had an "aching" and "stabbing" pain in her lower back and both shoulders which also radiated down both legs, but more so down the left. *Id.* at 97. She reported experiencing pain "all the time" that was brought on by sitting, standing and

-3-

bending. *Id.* at 98. In April 1999, plaintiff began taking medications, including Celebrex, Vicodan and Norflex for pain relief; she also rested and used a hot pack. *Id.* Plaintiff also claimed that her pain affected her daily activities to the extent that she has to rest all day and avoid physical activities and extended sitting. *Id.* at 99. Plaintiff reported that her husband and daughter took care of all the household chores. *Id.* at 94. Thus, her daily activities were limited to reading and watching television. *Id.* at 94, 98.

### 2. Plaintiff's Hearing Testimony

At the October 21, 2003 hearing before ALJ Fier, plaintiff testified that she had collected unemployment insurance benefits for four (4) months after her last day worked and then began receiving worker's compensation benefits in the sum of $250 per month. *Id.* at 206-07. When asked how she spent her day, plaintiff responded that she watches television and crochets, but in a limited manner because it hurts her right hand. *Id.* at 210. She testified that she can sit for approximately one (1) half an hour, but cannot stand for a long time because her legs hurt; she can walk a block and a half at a time. *Id.* at 213. While plaintiff was employed sewing bridal dresses, the heaviest weight she had to lift was thirty (30) pounds, but as of the time of the hearing, plaintiff testified she could not lift more than a couple of pounds. *Id.*

When questioned by ALJ Fier, plaintiff testified that she watched television for an hour at a time, or longer if it was a movie, cooked occasionally and sometimes played with her dog in her backyard. *Id.* at 216.

### 3. Vocational Expert Testimony

Vocational expert Dr. Fred Siegel testified at the October 2003 hearing. *Id.* at 222. He testified that plaintiff's vocation as a sewing machine operator was classified as "light" pursuant

to Dictionary of Occupational Titles ("DOT") 786.682-170 based on the fact that it involved the

operation of a machine. *Id.* Dr. Siegel also testified that plaintiff would be able to return to such

work in the event the ALJ found she was able to perform light work. *Id.* at 222-23.

Vocational expert Andrew Pastomak testified at plaintiff's January 2008 hearing before

ALJ Fier. *Id.* at 747. He stated that plaintiff's job as a sewing machine operator in a bridal shop

is considered DOT 786.685-030, an unskilled job rated at the light level of physical exertion. *Id.*

Pastomak further stated that a sewing machine operator is so rated because of the repetitive use

of the arms, hands and feet in operating and running material through the machine. *Id.* He

testified that plaintiff would be qualified to continue performing this type of work if the ALJ

found she was able to continue doing light work. *Id.* at 748.

## C.   Medical Evidence

### 1.   Medical Records Prior to the First Disability Hearing and Unfavorable Decision

On November 30, 1998, plaintiff saw Dr. Richard Nottingham who reported that
plaintiff's chief complaint was "pain in the low back region with radiation into the left leg." *Id.*
at 123. The report also states that plaintiff "has had this problem for many years" and was seen
by the doctor in 1992, at which time he diagnosed plaintiff with sciatica. *Id.* He noted that she
had experienced intermittent pains since then, but no numbness in her leg. *Id.*

Dr. Nottingham's physical examination of plaintiff revealed that she was somewhat

overweight and that her "[r]ange of motion of the back is markedly limited with pain." *Id.* A

straight leg raise to seventy (70) degrees caused pain, but plaintiff's deep tendon reflexes,

sensation and muscle power were intact. *Id.* An X-ray of plaintiff's lumbosacral spine revealed

mild degenerative changes and "left sciatica" for which Dr. Nottingham prescribed Naprosyn.

*Id.*

An MRI of plaintiff's lumbar spine showed that the "[h]eight of the lumbar vertebral

bodies are well maintained" and no evidence of fracture, marrow replacement process or spondylolisthesis. *Id.* at 124. The MRI also revealed a minimum central herniated disc at L4-L5, with minimum compression of the anterior thecal sac and L5-S1 discal level revealed circumferential discal bulging and discal degeneration without significant spinal stenosis. *Id.* at 125.

In December 1998, Dr. Peter Hollis saw plaintiff for a neurological evaluation. *Id.* at 164. He noted that plaintiff had no "complaint of weakness" or bowel or bladder dysfunction. *Id.* After reviewing the MRI films of her lumbar spine, Dr. Hollis noted "mild disc herniations in the two lower lumbar areas, but . . . no clear nerve compression." *Id.* Dr. Hollis noted, however, the suggestion of bilateral foraminal encroachment at L5-S1. *Id.* Straight leg raising was positive on the left at 60 degrees, but negative on the right; there was no spine tenderness; and plaintiff's sensation, gait and coordination were intact. *Id.* Dr. Hollis diagnosed lumbar radiculopathy with possible peripheral neuropathy and recommended further testing. *Id.*

By letter dated February 1, 1999, Dr. Hollis advised Dr. Nottingham that plaintiff had bilateral lumbar radiculopathy and that her options were either weight loss with aggressive exercise or surgical decompression. *Id.* at 163. On March 1, 1999, Dr. Hollis advised Dr. Nottingham that plaintiff declined surgery and he had no further specific recommendations for her. *Id.* at 162.

On April 6, 1999, Dr. Robert Duca examined plaintiff based on her complaints of severe pain in her lumbar spine including decreased range of motion in all planes and tenderness throughout her lumbosacral spine with swelling and decreased range of motion. *Id.* at 126. Regarding plaintiff's disability status, Dr. Duca reported that she was in "moderate distress" and

-6-

"is totally disabled and unable to work at this time." *Id.* He prescribed Celebrex, Norflex and Vicodin for plaintiff in addition to requesting authorization for epidural injections. *Id.* Plaintiff continued seeing Dr. Duca through the end of 2001 and her condition remained largely unchanged according to the doctor's notes. *Id.* at 520-28.

On May 21, 2001, Dr. Duca completed a form from the New York State Division of Disability Determinations on behalf of plaintiff in which he reported treating plaintiff since April 6, 1999. *Id.* at 115. Dr. Duca reported his treating diagnosis as: compression of the anterior thecal sac; a central herniated disc at L4-5; and an L5-S1 disc bulge with discal degeneration. *Id.* He indicated plaintiff's current symptoms as pain, a decreased lumbar range of motion, and intermediate radiculitis in both lower extremities. *Id.* Dr. Duca reported that plaintiff was initially prescribed Celebrex, Norflex and Vicodin and that he had requested authorization for epidural injections. *Id.* at 116.

Dr. Duca stated that there was no abnormality in plaintiff's gait and that she did not require an assistive device to walk. *Id.* at 117. He reported that plaintiff could lift and carry a maximum of five (5) to ten (10) pounds, could stand and/or walk for less than two (2) hours per day, could sit for less than six (6) hours per day and that her ability to push and/or pull was limited. *Id.* at 118. Furthermore, temperature changes and repetitive leg/foot motions aggravated plaintiff's lumbar pain. *Id.*

On November 20, 2001, Dr. Barbara J. Freeman performed an independent orthopedic medical examination of plaintiff. *Id.* at 546. The doctor reviewed plaintiff's medical records and listed plaintiff's height as five (5) feet, two (2) inches tall and her weight as 110 pounds. *Id.* at 546-47. Dr. Freeman observed that plaintiff ambulated with a normal gait, was able to get on

-7-

and off the table without difficulty and wore no lumbar supports or braces. *Id.* at 547. In her examination of plaintiff's lower back, Dr. Freeman found that plaintiff could flex to the level of her ankles with some straightening of the spine and that she had 20 degrees of extension, 30 degrees of side bend to the right and 20 degrees of side bend to the left. *Id.* Plaintiff could perform a light heel/toe stand. *Id.* Plaintiff could perform a straight leg raise on the right with non-radiating back pain, while the left leg elicited radiating back pain at 45 degrees. *Id.* The doctor also noted a mild lumbar spasm and concluded that plaintiff had internal derangement of the lower back. *Id.* Dr. Freeman found that plaintiff exhibited moderate disability and recommended consultation with a pain management/therapy specialist and, if requested, physical therapy three (3) times per week for two (2) months. *Id.*

On November 27, 2001, Dr. Benjamin Yentel saw plaintiff for an initial evaluation based on a "work related accident on 12/10/98 and sustained injuries of the neck, right shoulder and back." *Id.* at 188. Dr. Yentel reported that plaintiff was not experiencing acute distress but that the musculature of her cervical and lumbosacral spine was contracted due to muscle spasm. *Id.* The doctor also reported that plaintiff's cervical spine was tender when palpitated and her range of motion was impaired 30% in all directions. *Id.* Her right shoulder was also tender upon palpitation and her range of motion was impaired 15% in elevation. *Id.* Likewise, plaintiff's lumbosacral spine was also tender and her range of motion was impaired 30% in all directions. *Id.* Bragard's, Kemp's and Lindner's tests of plaintiff were all positive for nerve root irritation or disc lesions. *Id.*

On January 8, 2002, Dr. Yentel saw plaintiff for a follow-up visit where he noted that plaintiff continued to complain of pain over her cervical spine, right shoulder pains, and pains

over her lumbosacral spine. *Id.* at 187. The examination of her cervical spine showed a 25% range of motion impairment in all directions; the range of motion in her right shoulder remained the same; and the range of motion in her lumbosacral spine was impaired 25% in all directions. *Id.* Plaintiff's condition remained virtually unchanged at subsequent appointments with Dr. Yentel, except plaintiff reported that her condition worsened in May 2003. *Id.* at 165-66, 168-69, 171-72, 174-83, 185, 187.

On September 30, 2003, Dr. Yentel completed a medical assessment about plaintiff's ability to do work-related activities. *Id.* at 190-91, 195. He stated that plaintiff was treated three (3) times per week from November 27, 2001 through May 6, 2003. *Id.* at 190. Dr. Yentel reported that due to her lumbar radiculopathy, plaintiff could sit and stand and/or walk for one (1) to two (2) hours continuously and for a total of one (1) to two (2) hours per workday. *Id.* at 191. Dr. Yentel reported that plaintiff should not climb, stoop, kneel, balance, crouch, crawl, reach, push or pull. *Id.* As to plaintiff's ability to lift and/or carry objects, Dr. Yentel stated that plaintiff should not lift and/or carry any weight and any weight lifted or carried should be "very little." *Id.* at 195.

### 2.    Plaintiff's Post-December 31, 2003 Medical Records

On March 22, 2004, plaintiff saw Dr. David T. Neuman at the request of Dr. Yentel for an evaluation of her bilateral shoulder pain. *Id.* at 196. At that time, plaintiff complained of back pain, ulcers, high blood pressure, shortness of breath, frequent rashes, headaches and bruising easily; her only reported medication was Vioxx. *Id.* After his physical examination of plaintiff, Dr. Neuman noted that she was five (5) feet tall, weighed 200 pounds and walked gingerly without a limp. *Id.* Upon examining her left shoulder, the doctor reported that plaintiff

had full or almost full strength in her shoulder muscles. *Id.* He also noted that there is no evidence of pain or instability on the left side, but that there was a softness to her muscles on the left side as compared to the right. *Id.* With respect to her right shoulder, the doctor noted that there was pain at the limits of motion but that she had full or almost full strength in her shoulder muscles. *Id.* at 197. Hawkin's and Neer's tests were positive on both sides. *Id.* at 196-97. Dr. Neuman assessed plaintiff as having bilateral shoulder pain and bilateral shoulder internal derangement for which he recommended ice, physical therapy and anti-inflammatory medication. *Id.* at 197.

On May 1, 2007, Dr. Gordon Davis completed a multiple impairments questionnaire wherein he reported treating plaintiff monthly for left shoulder, left knee and lumbosacral strain since November 27, 2001. *Id.* at 514-18. Dr. Davis said plaintiff experienced severe pain and fatigue and that her pain worsened when she sat for more than thirty (30) minutes at a time. *Id.* at 515. According to Dr. Davis, plaintiff could stand or walk for one (1) hour in an eight (8) hour day, could sit for zero (0) to one (1) hours and could never lift or carry any weight. *Id.* at 515-16. Dr. Davis also reported that plaintiff was "[e]ssentially precluded" from using her arms for reaching, from using her fingers and hands for fine manipulation and from grasping, turning or twisting object with either hand. *Id.* at 516. The doctor found that plaintiff was incapable of even low stress work and would need to take unscheduled breaks at unpredictable intervals during an eight (8) hour workday. *Id.* at 517. Dr. Davis explained the basis of his conclusions about plaintiff's condition as: "Plaintiff states that she cannot work [due] to pain she frequently feels" and "[P]laintiff states she cannot work." *Id.* The doctor's report was based on the "history and physical of patient." *Id.* at 518.

On May 17, 2007, Dr. Duca completed a multiple impairments questionnaire wherein he stated that plaintiff was first treated on April 6, 1999 and that the last time she was examined prior to 2007 was October 11, 2001. *Id.* at 533. Relying on plaintiff's December 1999 MRI, Dr. Duca diagnosed plaintiff with a central herniated disc with compression of the anterior thecal sac and a L5-S1 disc bulge with discal degeneration. *Id.* Dr. Duca reported that plaintiff had paravertebral muscle spasm of the lumbar spine and slightly reduced strength in her lower extremities and that she could not walk on heels and toes without increased lumbar spine pain. *Id.* The doctor stated that plaintiff could occasionally lift or carry weights up to ten (10) pounds and could sit or stand/walk for up to one (1) hour per eight (8) hour work day. *Id.* at 534-35. In contrast to Dr. Davis, Dr. Duca found that plaintiff was not limited with respect to reaching overhead, using her fingers and hands for fine manipulation, or grasping, turning and twisting objects. *Id.* at 535. Dr. Duca reported that plaintiff's symptoms were severe enough to interfere with her attention and concentration and that she would need to take unscheduled breaks to rest at unpredictable intervals during the eight (8) hour work day. *Id.* at 536. Dr. Duca gave no basis for his conclusions about plaintiff's condition but wrote: "Plaintiff remains totally disabled and unable to work at this time for an undetermined period." *Id.*

### 3. Consultative Examination and Medical Expert Testimony

On May 29, 2001, plaintiff saw state agency examiner Dr. Kyung Seo, who reported that plaintiff walked into the examination room without any difficulty, had no problem standing up from a sitting position, had no difficulty getting on and off the examination table and her fine motor coordination was essentially normal in both hands. *Id.* at 146. Dr. Seo also reported that plaintiff's cervical spine showed normal cervical lordosis, that she had normal range of motion

-11-

and both of her upper extremities showed normal range of extension of both shoulders. *Id.* Dr. Seo found no muscle atrophy, diminished sensation on the left at L4-5,S1 and that toe and heel walking was possible although plaintiff complained of back pain. *Id.* at 146-47. Due to plaintiff's pain in both shoulders and low back pain, Dr. Seo reported that, at the time of examination, sitting, standing, bending, lifting and carrying heavy objects was "slightly limited." *Id.* at 147.

Medical expert Dr. Theodore Cohen testified at the October 2003 hearing before ALJ Fier. *Id.* at 217. After listening to plaintiff's testimony, Dr. Cohen stated: "the objective finding on the MRI, in which she has a herniated disc at L4-5 and L5-S1, [shows] there is no compression of the cord or the nerve roots." *Id.* He also testified that plaintiff did not meet or equal the listings and that she was capable of doing light work. *Id.* Dr. Cohen found that plaintiff's "complaints are greater than one would expect in the objective findings." *Id.* at 218.

At the second hearing before ALJ Fier on January 29, 2008, medical expert Dr. Louis Lombardi reviewed in detail plaintiff's doctors' medical findings. *Id.* at 687-705. Dr. Lombardi testified that upon consideration of all of the evidence, "it does not appear that . . . the claimant either meet[s], met or equaled a listing based on the fact that, not withstanding Dr. Hollis' report, there's no indication of compression of a nerve root." *Id.* at 705-06.

## II. Discussion

### A. Standard for Determining Disability

Pursuant to 42 U.S.C. § 423(d)(1)(A), the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. § 423(d)(2)(A).

**B.     Standard of Review**

Federal Rule of Civil Procedure ("FRCP") 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." In deciding a motion brought pursuant to FRCP 12(c), the Court applies "the same standard as that applicable to a motion under rule 12(b)(6)." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (citing *Ad-Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987)). Thus, a "party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Straw v. Apfel*, No. 98 Civ. 5089, 2001 WL 406184, at *2 (S.D.N.Y. Apr. 20, 2001).

When considering a motion to dismiss a complaint, or one for judgment on the pleadings, the court must assume as true all allegations contained in the complaint. *Chance v. Armstrong*,

143 F.3d 698, 701 (2d Cir. 1998). Furthermore, a court must construe the pleadings and any reasonable inferences in the light most favorable to the non movant. *Falls Riverway Realty, Inc. v. City of Niagara Falls, N.Y.*, 754 F.2d 49, 54 (2d Cir. 1985). "In resolving motions made pursuant to [FRCP] 12(c), a court is generally limited to considering the factual allegations set forth in the pleadings" because the use of materials outside the scope of the pleadings converts the motion into one for summary judgment. *Abiona v. Thompson*, 237 F. Supp. 2d 258, 265 (E.D.N.Y. 2002). Where the parties refer to the administrative record, regulations and ALJ decisions, however, those materials are deemed incorporated into the pleadings and are properly considered by a court deciding a motion brought pursuant to FRCP 12(c). *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

In deciding a motion for judgment on the pleadings, the reviewing court "must first be satisfied that the 'claimant has had a 'full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.' " *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (quoting *Echevarria v. Sec'y of Health & Human Serv.*, 685 F.2d 751, 755 (2d Cir. 1982)). "It is the Commissioner's affirmative responsibility to develop the record in such a way as to ensure a full and fair hearing." *Crespo v. Barnhart*, 293 F. Supp. 2d 321, 324 (S.D.N.Y. 2003). *See, e.g., Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

After the Court is satisfied that the record is fully developed, it "reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada*, 167 F.3d at 773. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (holding that applying substantive law to uphold a denial of benefits before ensuring that the ALJ applied the correct legal principles creates "an unacceptable risk that a claimant will be deprived

-14-

of the right to have her disability determination made" pursuant to the proper legal standards).

"Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada*, 167 F.3d at 773. A decision denying benefits must be affirmed if it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Meney v. Astrue*, 793 F. Supp. 2d 621, 623 (2011) ("The Commissioner's decision that plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards."); *Stiggins v. Barnhart*, 277 F. Supp. 2d 239, 243 (W.D.N.Y. 2003). Thus, a court's "function is limited to assessing whether the Commissioner applied the proper legal standards in making his determination and whether that determination is supported by the substantial evidence on the record as a whole." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 221 (S.D.N.Y. 2004) (quoting *Stancel v. Apfel*, No. 99 Civ. 9339, 2000 WL 1839758, at *3 (S.D.N.Y Dec. 13, 2000)). "[I]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). *See Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (holding that a " 'court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review' ") (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

"Substantial evidence requires 'less than a preponderance, but more than a scintilla of evidence [and] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *T-Mobile Northeast LLC v. Town of Islip*, 893 F. Supp. 2d 338, 354 (E.D.N.Y. 2012) (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Secretary for further development of the evidence is required. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (citing cases).

## C. Whether the ALJ Applied the Correct Legal Standards

### 1. Legal Standards for Disability Evaluations

Social Security Administration regulations establish a five-step process that the Commissioner is required to follow in evaluating a claim for disability benefits. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); *Stiggins*, 277 F. Supp. 2d at 242; 20 C.F.R. § 404.1520. "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." *Draegert*, 311 F.3d at 472; *see* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In performing the disability evaluation, the ALJ must consider certain facts, including: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (citing cases). The analysis is sequential: if the claimant is found disabled or not disabled at a step, the Secretary makes its decision or determination and does not proceed to the next step. *Meney*, 793 F. Supp. 2d at 623; 20 CFR § 404.1520(a)(4).

"The claimant bears the burden of proof as to the first four steps, while the Secretary

bears the burden of proof as to the last step." *Murphy v. Sec'y of Health and Human Servs.*, 872 F. Supp. 1153, 1157 (E.D.N.Y. 1994) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)).

## 2.    ALJ Strauss's Decision

As to the first step, whether the claimant is performing substantial gainful activity, ALJ Strauss found that plaintiff "did not engage in substantial activity during the period from her alleged onset date of December 28, 1998 through her date last insured of December 31, 2003."[3] Tr. 324. As to the second step, the ALJ wrote that "[t]hrough the last date insured, the claimant had the following severe impairments: cervical spine sprain/strain, status post right shoulder injury, and lumbosacral sprain/strain and disc disease." *Id.* Third, ALJ Strauss found that "through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* Accordingly, before proceeding to the fourth step, ALJ Strauss determined that "through the date last insured, the claimant has the residual functional capacity to perform the full range of light work, as defined in 20 CFR 404.1567(b), in that she could lift/carry ten [10] pounds frequently and twenty [20] pounds occasionally, sit for six [6] hours and stand/walk for six [6] hours in an eight [8] hour workday." *Id.* at 325. Under step four of the sequential evaluation, therefore, the ALJ found that plaintiff was not disabled and was able to

---

3. The instant case was before ALJ Strauss on remand from the Appeals Council pursuant to the Order of the Honorable Arthur D. Spatt, United States District Judge, Eastern District of New York, dated March 5, 2007, in case number 05-CV-4382. Tr. 321. Judge Spatt remanded the case on the basis that ALJ Fier failed to give good reasons for the lesser weight accorded to Dr. Duca's opinions which violates the treating physician rule. *Id.* at 412. The Appeals Council directed that the case be heard by a different ALJ on remand and directed the ALJ to, *inter alia*, "give further consideration to the treating source opinions" pursuant to 20 CFR § 404.1527 and explain the weight given to those opinions. *Id.* at 321.

return to her past work, at which time the evaluation ended.

The ALJ followed Social Security regulations by conducting the sequential evaluation and issuing a lengthy opinion, supporting each of her conclusions with detailed factual findings. *Id.* at 318-339. The ALJ also considered the medical facts and opinions, plaintiff's subjective complaints and her educational background, age and work experience. The ALJ's decision to rely on the medical experts' testimony and opinions instead of plaintiff's treating sources is supported by objective medical evidence. Furthermore, the ALJ applied the factors necessary to determine the weight to be given to plaintiff's treating doctors' opinions. Accordingly, the ALJ applied the correct legal standards in determining that plaintiff was not disabled within the meaning of the Social Security Act.

**D.    Whether the ALJ's Decision is Supported by Substantial Evidence**

Having determined that the ALJ applied the proper legal principles in evaluating plaintiff's eligibility for Social Security disability benefits, the second part of the inquiry is whether the decision is supported by substantial evidence.

Plaintiff argues that no substantial evidence supports the ALJ's finding that plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).[4] Rather, pursuant to medical vocational rule 20 CFR Pt.404, Subpt. P. App. 2 §

---

4. Title 20 CFR § 404.1567(b) provides that light work:

> [I]nvolves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for

201.09, a person closely approaching advanced age, with limited or less education, and without transferrable skills, must be found disabled, even if capable of performing sedentary work. Plt. Mem. in. Supp. p. 3. Plaintiff contends that she: (1) was 51 years old on her alleged onset date, which makes her a person closely approaching advanced age; (2) only finished either kindergarten or third grade in Italy, a less than limited or marginal education rendering plaintiff illiterate; and (3) has no transferable skills. Plaintiff makes two (2) primary arguments as to why the ALJ's findings are incorrect: (1) the opinions of plaintiff's treating physicians are entitled to controlling weight; and (2) the opinion of the treating physicians are entitled to the greatest weight. Plaintiff requests that this case be remanded solely for a calculation of benefits.

## 1.    The Treating Physician Rule

The treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). *See Arzuaga v. Bowen*, 833 F.2d 424, 426 (2d Cir. 1987) (holding that the rule "states that the claimant's treating physician's diagnoses and findings regarding the degree of claimant's impairment are binding on the ALJ unless there is substantial evidence to the contrary"). The rule "governs the weight to be accorded the medical opinion of the physician who treated the claimant . . . relative to other medical evidence before the fact-finder, including opinions of other physicians." *Schisler v. Heckler*, 787 F.2d 76, 81 (2d Cir. 1986). "The regulations also require the ALJ to set forth her reasons for the weight she assigns to the treating physician's opinion." *Shaw*, 221 F.3d at 134.

---

long periods of time.

Despite the treating physician rule's requirement that an ALJ defer to a claimant's treating physician's opinion, "the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). "The factors that must be considered when the treating physician's opinion is not given controlling weight include: '(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.' " *Shaw*, 221 F.3d at 134 (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

## 2. Whether the ALJ Properly Deviated from the Treating Physician's Rule

After reviewing all of the evidence, the ALJ wrote that she found "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment [that plaintiff is capable of light work]." Tr. 334. ALJ Strauss found that plaintiff's "subjective complaints of pain and discomfort during the period at issue are not corroborated by objective tests or supported by the treating source opinions." *Id.* Instead, in determining that plaintiff was not entitled to disability benefits, the ALJ relied "upon the testimony of Dr. Theodore Cohen the medical expert who opined that the claimant had no impairment that meets or equals the listings." *Id.* at 335. In addition, the ALJ found that medical expert Dr. Lombardi's testimony was consistent with Dr. Cohen's medical expert testimony in

that both independently found that plaintiff's alleged disability was not corroborated by objective medical evidence. *Id.* at 336.

Dr. Cohen noted that plaintiff "has a herniated disc but no compression of the cord or nerve roots and that compression of the anterior thecal sac is not clinically significant." *Id.* At the hearing before ALJ Fier on October 21, 2003, Dr. Cohen testified that the "objective findings of the MRI show that the claimant has a herniated disc at L4-5 and L5-S1 but there is no compression of the cord of the nerve roots." *Id.* at 333. He noted that a physical examination of plaintiff showed some restricted movement primarily of the lower back and a little restriction of the upper extremities. *Id.* When questioned by plaintiff's attorney at the initial hearing before ALJ Fier, Dr. Cohen testified that "while the MRI shows some compression of the thecal sac it is not clinically significant and the claimant's complaints are not supported by objective findings. *Id.* at 333-34.

Dr. Cohen stated that it was very difficult for him to agree with Dr. Duca's opinion that the claimant is totally disabled based on the lack of evidence demonstrating atrophy or significant weakness. *Id.* at 335. Rather, plaintiff was able to "ambulate, get up from a chair, and walk on her heels and toes." *Id.* Dr. Cohen noted that Dr. Duca's records were problematic in that he failed to "document any neurological or neurovascular deterioration." *Id.* Nor did Dr. Duca "develop his examination beyond the decreased range of motion or document his findings over a period of time to show the completeness of his examinations." *Id.* Dr. Cohen also said that the "findings of decreased sensation on the left L4-5, S1 [are] not consistent with clinical and diagnostic tests and other factors were not present." *Id.* Dr. Cohen also pointed out that there were no MRI findings with EMG/NCV studies to support the radiculopathy diagnosis. *Id.*

With respect to plaintiff's other treating doctor, Dr. Yentel, Dr. Cohen testified that the doctor's examination of plaintiff did "not reveal any findings of atrophy, sensory loss and pain distribution." *Id.* at 336. Dr. Cohen also noted that Dr. Yentel "lumped things together" and failed to explain his techniques for testing plaintiff's range of motion, perhaps because Dr. Yentel's speciality was internal medicine, not orthopedics. *Id.*

Medical expert Dr. Lombardi did not agree with Dr. Duca's findings that plaintiff was totally disabled because she complained about pain, but had no indication of atrophy or weakness. *Id.* at 336. ALJ Strauss found this testimony to be consistent with Dr. Cohen's because both said the finding of reduced sensation at left L4-L5 S1 "is not consistent with clinical diagnostic tests because if there is a herniated disc that involves L4, L5 it usually involves the L5 nerve root" which generally results in weakness of the foot and hip abduction. *Id.* Such symptoms have to be corroborated by an MRI and nerve conduction tests, yet there is no evidence in the record that plaintiff's treating doctors performed such tests.

Dr. Freeman, the independent medical examiner, said plaintiff "was able to get on and off the examining table without difficulty and could perform heel and toe standing." *Id.* at 546. Dr. Freeman's observations were corroborated by Drs. Seo and Neuman. The ALJ also gave Dr. Seo's opinion significant weight based on the fact that he was a thoracic surgeon and because he conducted a full and appropriate examination of plaintiff, concluding that plaintiff's ability to sit, stand, bend, lift and carry heavy objects was "slightly limited" as of May 2001. *Id.* at 147; 337.

As set forth above, an ALJ must explain the weight given to the treating physician's opinion by considering the: length of the treatment relationship; nature and extent of the relationship; the supportability of the source's opinion; the consistency of the opinion with other

-22-

medical evidence; and whether the opinion is based on the physician's speciality. Here, the ALJ wrote that she "was aware that Dr. Duca and Dr. Yentel both treated the claimant over an extensive period of time and although Dr. Yentel was an internist and Dr. Duca was an orthopedist both of their records lack the completeness to support their functional limitations as fully explained by the two medical experts who reviewed the file, Dr. Theodore Cohen and Dr. Louis Lombardi . . . [who] both came to the same conclusion independently." *Id.* at 336-37.

As instructed by the Appeals Council, ALJ Strauss also gave further consideration to the treating source opinions and discussed the weight afforded those opinions. In her decision, the ALJ made a detailed record of plaintiff's visits with Dr. Duca beginning with her initial visit on April 6, 1999. *Id.* at 327. In addition to discussing the substance of plaintiff's visits with Dr. Duca, the ALJ also noted: "The next and last entry in the treatment notes is dated May 17, 2007, at which time Dr. Duca wrote that claimant had complaints of lumbar spine pain, and radiculistis to both buttocks and knees. He stated that the claimant has not had any treatment or medications since her last visit, which was on October 11, 2001. The entry also stated that the claimant is seeing Dr. Davis." *Id.* at 328. Subsequent to plaintiff's May 17, 2007 examination, Dr. Duca completed a "Multiple Impairments Questionnaire" on June 6, 2007 wherein he reported October 11, 2001 as his most recent examination of plaintiff prior to May 2007, i.e., "almost 41 months subsequent to the date last insured." *Id.* The ALJ also pointed out that the claimant's limitations as reported by Dr. Duca on June 6, 2007 "are similar to those reported by Dr. Duca in the questionnaire from the Disability Assistance Division of Disability Determination dated May 21, 2001." *Id.*

The ALJ also wrote:

I do not give the opinions of Dr. Duca and Dr. Yentel controlling weight or significant weight because their opinions are inconsistent with their records that lack specific findings as to atrophy, sensory loss and pain distribution. Their conservative treatment i.e. physical therapy, anti-inflammatory medications, muscle relaxants and an opiate derivative for moderate pain is inconsistent with their findings of almost total physical immobility and what the claimant described in her 2003 testimony of activities of daily living. Dr. Yentel's records show only a percentage of impairment in range of motion and tenderness on palpitation. This information does not support his opinion of the claimants limitations. Further, he is an internist, not an orthopedist and perhaps that is why he did not conduct a more thorough orthopedic examination. Both Dr. Duca and Dr. Yentel prepared their respective reports and rendered their opinions with a view towards the claimant's Worker's Compensation claim. A Worker's Compensation award is based on a different standard then a claim for Social Security disability and I have taken that into consideration in assigning weight and significance to their respective opinions.

*Id.* at 337. Given all of the foregoing, the Court holds that the ALJ's decision is supported by substantial evidence. Furthermore, on these facts, the Commissioner properly deviated from the treating physician's rule. Accordingly, the Commissioner's decision is affirmed in its entirety.

## III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is **GRANTED** and plaintiff's cross-motion is **DENIED**. The Commissioner's decision denying plaintiff Social Security Disability benefits is affirmed and the Clerk of the Court is instructed to close this case.

**SO ORDERED**.

Dated: February 5, 2014
       Central Islip, New York

s/ Sandra J. Feuerstein
_____
Sandra J. Feuerstein, U.S.D.J.

-24-